**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| KURT A. WELLS,             ) | |
|                              ) | |
|      **Plaintiff,**            ) | |
|                              ) | |
|      **v.**                      ) | **CAUSE NO. 1:16-cv-00022-SLC** |
|                              ) | |
| **COMMISSIONER OF SOCIAL**     ) | |
| **SECURITY,** *sued as Nancy A.*      ) | |
| *Berryhill, Acting Commissioner of SSA,*[1] ) | |
|                              ) | |
|      **Defendant.**          ) | |

## OPINION AND ORDER

Plaintiff Kurt A. Wells appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI").[2] (DE 1). For the following reasons, the Commissioner's decision will be

REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in

accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Wells applied for DIB and SSI in August 2012, alleging disability as of April 13, 2012.

(DE 8 Administrative Record ("AR") 193-202). Wells was last insured for DIB on

December 31, 2012 (AR 20, 220), and thus, with respect to his DIB claim, he must establish

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, — F.3d —, 2017 WL 398309 (7th Cir. Jan. 30, 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (DE 11); *see* 28 U.S.C. § 636(c).

that he was disabled as of that date.  *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that with respect to a DIB claim, a claimant must establish that he was disabled as of his date last insured in order to recover DIB).

The Commissioner denied Wells's application initially and upon reconsideration.  (AR 137-52).  After a timely request, a hearing was held on November 8, 2013, before Administrative Law Judge Patricia Melvin ("the ALJ"), at which Wells, who appeared pro se; James Adams, Wells's case manager at the Bowen Center; and a vocational expert, Sharon Ringenberg (the "VE"), testified.  (AR 39-86).  On May 14, 2014, the ALJ rendered an unfavorable decision to Wells, concluding that he was not disabled because despite the limitations caused by his impairments, he could perform a significant number of unskilled jobs at all exertional levels in the economy.  (AR 20-30).

After the hearing, Wells retained counsel to represent him.  (AR 20; DE 17 at 1).  The Appeals Council denied Wells's request for review (AR 1-15), at which point the ALJ's decision became the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.

Wells filed a complaint with this Court on January 21, 2016, seeking relief from the Commissioner's final decision.  (DE 1).  Wells advances three arguments in this appeal:  (1) that the ALJ improperly evaluated the opinion of Candace Lemke, a psychiatric nurse practitioner; (2) that the ALJ improperly discounted his symptom testimony; and (3) that the ALJ improperly weighed the opinions of Drs. Hill and Horton, the state agency psychologists.  (DE 17 at 7-13).

## II.  FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Wells was 57 years old (AR 30, 193); had a GED and a real estate appraiser's license (AR 225); and possessed past relevant work experience as a real estate appraiser and an account manager (AR 225).  He alleges disability due to generalized anxiety disorder with agoraphobia, specific phobia of needles, degenerative changes in the right knee, degenerative changes in the lumbar spine, degenerative disc disease mostly at L4-L5 level, and a degree of central canal stenosis in the lower lumbar region.  (DE 17 at 2).

### A.  *Wells's Testimony at the Hearing*

At the hearing, Wells, who is six feet tall and weighed 275 pounds at the time, testified that he is divorced and lives alone in a subsidized apartment.  (AR 46).  He was on Medicaid and was receiving food stamps.  (AR 48).  He stated that he was a self-employed real estate appraiser for eight years, which was a full-time job; however, he had never actually worked full time because he always had jobs where he could go home if he had a panic attack.  (AR 49).  He is independent with his self care and performs all of the household tasks, including shopping, laundry, vacuuming, cleaning, and taking out the garbage.  (AR 71-72).  He has a driver's license and used to drive almost every day, but he no longer does so because he lost his car.  (AR 71).  In his spare time, he enjoys watching mysteries and documentaries on the computer.  (AR 71).

When asked why he thought he could not work, Wells indicated that his most severe problem is his phobia of injections.  (AR 52).  He stated that this phobia causes him to have up to a dozen panic attacks every day.  (AR 52-54).  Most of these attacks are minor, lasting just a few

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 803-page administrative record necessary to the decision.

minutes, but some can last several hours.  (AR 53).  When he has an attack, he quickly becomes

very hot and sweaty and then loses his breath, so he quickly finds a way to cool down, such as

going to his car, which is his "safe zone," and running the air conditioning.  (AR 53).  He also

has agoraphobia, stating that his "only safe place is at home."  (AR 57).  He has panic attacks

when leaving home; however, since being involved in therapy, he has done "pretty well" with

riding the bus, as he has had to get off the bus only a few times due to panic attacks.  (AR 57).

He has no problems getting along with people but tries to avoid them by staying home; the only

people he goes anywhere with are his sister, his mother, and his son.  (AR 70-71).

Wells was taking two anti-anxiety medications and was participating in counseling, in

which he was learning coping skills.  (AR 54-56).  He indicated that this treatment is effective,

but that even with his medications, he still has four to five panic attacks a day.  (AR 55-56, 58,

61).  He had never been to a hospital for a panic attack because hospitals present his "biggest

fear"; he did, however, admit himself to St. Joe Behavioral Center for alcohol detoxification in

2002.  (AR 56; *see* AR 378).

As to his physical problems, Wells complained of sharp pain in his low back that radiates

to his legs, which had started about six months earlier.  (AR 62-63).  The pain, which he rated as

an "eight or a nine" on a 10-point scale, occurs when he walks or stands "too long" and goes

away almost instantly when he sits down.  (AR 63, 65-67).  He estimated that he could walk up

to 400 feet and stand for 15 minutes before needing to sit down; he has no pain when sitting and

can sit indefinitely.  (AR 67).  He thought that he could lift 20 pounds, and he had no difficulty

with reaching, gripping, handling, pushing or pulling with his arms, or climbing stairs; his

balance, however, "has been bad" for the last 10 years, causing him to fall on a few occasions, so

he uses a shower chair. (AR 68-69). He takes Naproxen and Tylenol for his back pain and denied any medication side effects. (AR 63-65). He stated that he has a "bad knee," but it does not keep him from working. (AR 67). He also complained of vision problems that affect his reading, but he still is able to use a computer. (AR 69).

### B. Testimony of Wells's Case Manager

James Adams, Wells's case manager at the Bowen Center, also testified at the hearing. (AR 74-79). He had been treating Wells two to three times per week for the past seven months. (AR 76). He stated that Wells has made amazing progress, but that his phobia is so severe that on an outing to the Art Museum, he glanced at a picture of a flower that vaguely resembled a needle and he had a full panic attack. (AR 75-78). Adams estimated that he had witnessed Wells have a dozen severe panic attacks that lasted for several hours and caused him to shake; sometimes Wells has to lie on a tile floor in a public place during a panic attack because he needs to feel the cold. (AR 76-78). Adams stated that when they were working on desensitization therapy, Wells was having 10 to 12 panic attacks a day. (AR 77). When they first started therapy, Wells could not get on a bus by himself, but he has progressed enough to do so. (AR 77). It takes Wells one to two hours of preparation to be able to leave his home. (AR 78).

### C. Summary of the Relevant Medical Evidence Pertaining to Wells's Physical Health

In September 2012, Wells underwent a physical examination by Dr. Venkata Kancherla at the request of the state agency. (AR 358-60). Wells claimed that his anxiety was so bad that he could not function. (AR 359). On exam, his far vision was blurry in the right eye and 20/60 in his left eye, and his near vision was 20/20 with glasses. (AR 359). His muscle strength and

tone were normal, but he had some fine tremors in his hands. (AR 359). His gait was normal, and he was able to squat and walk on his heels and toes. (AR 359). He became anxious and was hyperventilating at times during the examination. (AR 359). Dr. Kancherla's impression was that it was a normal physical examination with normal gait and medication-controlled hypertension, except that Wells needed a ophthalmology evaluation and a psychiatric evaluation. (AR 360).

That same month, Dr. J.V. Corcoran, a state agency physician, reviewed Wells's record and concluded that his physical impairments were not severe. (AR 91-92). Dr. M. Ruiz, another state agency physician, affirmed Dr. Corcoran's opinion in December 2012. (AR 116-17).

In March 2013, Wells visited Dr. Robert Wilkins, his family practitioner, due to back pain. (AR 750-51). The pain occurred with motion and was relieved by medication and sitting, and it caused some limitation of his normal activity. (AR 750). He appeared to be in pain during the examination. (AR 751). Wells reported that his pain had worsened in the past few months because he had been walking more and using the bus system. (AR 750). He weighed 268 pounds at the time. (AR 750). A chair test was positive, but a straight leg raise test was negative; no muscle atrophy or tenderness was observed. (AR 751). Dr. Wilkins prescribed Naproxen. (AR 751). An X-ray of Wells's lumbar spine showed degenerative disc disease mostly at L4-L5, and bony landmarks suggested a degree of central canal stenosis in the lower lumbar region; there was no acute bone pathology. (AR 744-45).

In July 2013, Wells returned to Dr. Wilkins for his back pain. (AR 748-49). Wells reported that his pain extended down both legs and that his thighs felt numb. (AR 748). Although Naproxen had helped previously, it was not currently helping. (AR 748). He stated

that standing causes his back pain and that lifting and carrying his laundry increases his pain; Dr. Wilkins observed that his gait was stiff upon getting up. (AR 748-49). He weighed 286 pounds at the time. (AR 749). A chair test and a straight leg raise test were negative. (AR 749). Dr. Wilkins's impression was that Wells's back pain was mostly from arthritis of the facet joints. (AR 749).

In September 2013, Wells returned to Dr. Wilkins for his back pain. (AR 746). He described his low back pain as "burning," stating that it caused some limitation of his activity. (AR 746). He appeared to be in pain and demonstrated a limping gait; he had no associated leg weakness. (AR 746-47). He weighed 291 pounds at the time. (AR 746). Dr. Wilkins prescribed Tramadol. (AR 747). An MRI of Wells's lumbar spine revealed a moderate bulge at L4-L5, and a mild bulge, mild facet arthropathy, and moderate foraminal narrowing at L5-S1. (AR 742-43).

### D. Summary of the Relevant Medical Evidence Pertaining to Wells's Mental Health

In April 2012, Dr. Wilkins documented that Wells had a generalized anxiety disorder, described as moderate. (AR 332). Dr. Wilkins indicated that Wells's symptoms were worsening and that he had a lot of anxiety, but he was no longer having panic attacks. (AR 332). Dr. Wilkins stated that Wells's condition interferes with his daily functioning and impedes his concentration. (AR 332). Dr. Wilkins opined that Wells's anxiety and depression render him unable to work and not a good candidate for rehabilitation services. (AR 331).

In September 2012, Wells underwent a mental status examination by Wayne Von Bargen, Ph.D., at the request of the state agency. (AR 362-64). Wells related his severe phobia of needles, stating that he had self-medicated for years by drinking alcohol or stealing his wife's

medication. (AR 362). He indicated that his phobia had contributed to his divorce and his vocational difficulties. (AR 362). He had become increasingly anxious and reclusive over the years, but was not housebound. (AR 364). His affect was moderately anxious, but his verbalizations were logical, relevant, and coherent; his alertness and activity level were normal overall. (AR 362). Dr. Von Bargen opined that Wells's history and current presentation revealed an anxiety disorder, manifested by a specific fear of needles, panic attacks, and generalized anxiety, and likely a personality disorder with avoidant and obsessive-compulsive features. (AR 363). Dr. Von Bargen's diagnoses included an anxiety disorder, NOS; a specific phobia; and a personality disorder NOS (provisional). (AR 364). He assigned a Global Assessment of Functioning ("GAF") score of 55.[4] (AR 364).

Later in September 2012, Stacia Hill, Ph.D., a state agency psychologist, reviewed Wells's record and concluded that he had a mild restriction in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (AR 92-93). On a mental RFC assessment form, Dr. Hill opined that Wells was moderately limited in understanding, remembering, and carrying out detailed instructions; working in coordination with or in proximity to others without being distracted by them;

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, several medical sources of record used GAF scores in assessing Wells, so they are relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; and responding appropriately to changes in the work setting. (AR 94-96). Wells was not significantly limited in the remaining mental categories. (AR 94-96). In her narrative, Dr. Hill concluded that while Wells would likely have difficulty with complex tasks, he could "complete simple tasks on a sustained basis without special considerations preferably in an environment with limited social interaction." (AR 96). In December 2012, B. Randal Horton, Psy.D., reviewed Wells's record and reached the same conclusions as Dr. Hill. (AR 117-20).

In February 2013, Wells was evaluated by Ashley Radtke, a clinician at the Bowen Center. (AR 596-99). He felt anxious and disoriented because he did not have his car as an escape route. (AR 596). He reported that his anxiety began as a teenager, that his family has a history of mental illness, and that he has tried to self-medicate with marijuana and abusing prescription medication. (AR 596). He had participated in mental health treatment on and off for a long time. (AR 596). He had financial concerns and was seeking disability, as he reported not being able to work because of his anxiety. (AR 596, 598). Ms. Radtke observed that Wells's mood and affect were anxious, and his activity level was restless. (AR 596). His memory, perception, and orientation were normal, and his attitude was cooperative. (AR 596). He had coherent thinking, but racing thoughts; his speech was rapid and pressured, but normal. (AR 596). He was taking Alprazolam, Ambien, Ziac, Lisinopril, and Zoloft, which were all prescribed by his family practitioner. (AR 597). He had suicidal ideation a year earlier and had researched ways to commit suicide; he had no homicidal ideation. (AR 597). Ms. Radtke's diagnostic impression was panic disorder with agoraphobia; generalized anxiety disorder; and

specific phobia of blood, injection, injury type.  (AR 598).  She assigned him a fair prognosis. (AR 599).

In April 2013, Wells was evaluated by Candace Lemke, a psychiatric nurse practitioner at the Bowen Center.  (AR 378-82).  She noted his past hospitalization for alcohol detoxification and that he had been in and out of psychiatric care most of his adult life.  (AR 378).  He appeared severely anxious throughout the interview, as he was clenching the chair with white knuckles and his legs were jittering.  (AR 379).  His thought content and stream of thought were normal; he had no delusions, paranoia, or suicidal or homicidal ideation.  (AR 379).  His affect and mood were congruent.  (AR 379).  He had fair judgment and insight, average intellect, and adequate concentration.  (AR 380).  She indicated the following diagnoses:  generalized anxiety disorder; panic disorder with agoraphobia; specific phobia of needles; alcohol dependence, full sustained remission; cannabis dependence, full sustained remission; and opioid dependence, early remission.  (AR 381).  She assigned him a current GAF of 50 and a highest-in-the-past-year GAF of 50.  (AR 381).

In September 2013, Ms. Lemke wrote a letter on Wells's behalf.  (AR 630).  She stated that he had been undergoing psychiatric care for several years, but that despite intensive psychotherapy, hypnotherapy, and antidepressant, antipsychotic, and antianxiety treatment, he had made "very little progress in the way of conquering his agoraphobia, social phobia and his intense fear of needles."  (AR 630).  She stated that Wells "truly cannot work outside of his home."  (AR 630).

Wells participated in treatment at the Bowen Center from February 2013 through December 2013.  He was seen approximately four times by Ms. Lemke (AR 378-81, 398-99,

401-02, 754-57) and 16 times by Dr. Klinton Krouse (AR 383-88, 413-18, 477-84, 719-20, 756-59) for medication management.  He was seen more than 100 times by three mental health clinicians or case managers at the Bowen Center for mental health counseling, desensitization therapy, and coping skills for his agoraphobia and panic attacks.  (*See* AR 421-803).  In September 2013, Wells's anxiety and panic attacks were described as "Improved, Not Controlled."  (AR 395).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted).  "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the

ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

### B. The Commissioner's Final Decision

On May 14, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 20-30). At step one of the five-step analysis, the ALJ found that Wells had not engaged in substantial gainful activity since his alleged onset date. (AR 21). At step two, the ALJ found that Wells's anxiety disorder and depression were severe impairments, but his mild degenerative changes of the right knee, degenerative disc disease of the lumbar spine, hypertension, and obesity were non-severe impairments. (AR 21). At step three, the ALJ concluded that Wells did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 23). Before proceeding to step four, the ALJ determined that Wells's symptom testimony was not entirely credible (AR 26), and the ALJ assigned him the following RFC:

> [T]he claimant has the [RFC] to perform a full range of work at all exertional levels but with the following non-exertional limitations: he is limited to simple, routine, and repetitive tasks, with simple defined as specific vocational preparation levels one and two. In addition, the claimant is limited to low stress jobs, defined as those that require only occasional decision-making, with only occasional changes in the work setting and with no strict production quotas. Instead, the emphasis would be on a per shift, rather than per hour, basis. Finally, the claimant is limited to jobs that require only occasional interaction with the general public, co-workers, and supervisors.

(AR 24-25).

At step four, the ALJ found that Wells was unable to perform any of his past relevant work. (AR 29). Based on the RFC and the VE's testimony, the ALJ concluded at step five that

Wells could perform a significant number of unskilled jobs at all exertional levels in the economy, including industrial cleaner, laundry worker, and dishwasher. (AR 30). Therefore, Wells's applications for DIB and SSI were denied. (AR 30).

### C. The ALJ's Consideration of Wells's Symptom Testimony Will Be Remanded

Wells argues, among other things, that the ALJ improperly discounted his symptom testimony concerning his physical and mental limitations. Wells's arguments ultimately have merit, necessitating a remand of the ALJ's decision.

An ALJ's credibility determination concerning a claimant's symptom testimony is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), her determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Here, the ALJ found Wells's symptom testimony "not entirely credible" for essentially two reasons. (AR 30). The ALJ stated that the alleged severity of Wells's symptoms and his degree of limitation with respect to his back pain and anxiety, panic, and phobia are not supported by objective medical evidence. (AR 26-27). The ALJ also cited Wells's performance of a range of daily living activities as undermining his symptom testimony. (AR 23-24, 26).

As to the first reason, "[o]bjective medical evidence . . . is a useful indicator to assist [the Commissioner] in making reasonable conclusions about the intensity and persistence of [the claimant's] symptoms and the effect those symptoms, such as pain, may have on [the claimant's] ability to work." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). "The discrepancy between the degree of pain [and other symptoms] attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating [his] condition." *Powers*, 207 F.3d at 435-36.

With respect to Wells's back pain, the ALJ first cited Dr. Kancherla's exam in September 2012 reflecting normal physical examination findings, including a normal gait, no deformity or tenderness of the lumbosacral spine, and straight leg raising to 70 degrees bilaterally. (AR 27 (citing AR 358-60)). Wells's symptom testimony is consistent with these objective findings, as he stated that his back pain started about six months before the November 2013 hearing.[6] (AR 62-63).

In 2013, however, Wells saw Dr. Wilkins in March, July, and September due to back pain. Wells complained of sharp, burning pain in his low back that extended down both legs and caused numbness in his thighs. (AR 748). Standing, walking, lifting, and carrying all increased his pain, and he exhibited a limping gait. (AR 746-49). A chair test was positive at one visit, but straight leg raising tests were negative; there was no evidence of atrophy or leg weakness. (AR 749, 751). Dr. Wilkins prescribed several medications. (AR 747-48, 751). X-rays revealed degenerative disc disease at L4-L5 and a degree of central canal stenosis in the lower lumbar

---

[6] As such, Wells's back pain is relevant only to his SSI claim, as he conceded that his back pain started in early 2013—that is, after his DIB-eligibility expired on December 31, 2012.

spine, but no acute bony pathology. (AR 744-45). An MRI of Wells's lumbar spine revealed a moderate bulge at L4-L5, and a mild bulge, mild facet arthropathy, and moderate foraminal narrowing at L5-S1. (AR 742-43).

When considering this objective medical evidence from 2013, the ALJ stated:

On March 27, 2013, inspection of the claimant's lumbar spine showed no muscle atrophy, tenderness, or swelling. Although a chair test was positive, straight leg raising was negative. The same day, x-rays of his lumbar spine showed degenerative disc disease, mostly the L4-L5 level, with the bony landmarks suggesting a "degree of central canal stenosis in the lower lumbar region." However, there was no indication of acute bony pathology. Later, on July 22, 2013, both chair testing and straight leg raising were negative. On that occasion, Dr. Wilkins stated that the claimant's back pain seemed to be "mostly from arthritis of the facet joints."

(AR 28 (citations omitted)).

The ALJ's rationale for finding the objective medical evidence from 2013 inconsistent with Wells's complaints of back pain is difficult to trace. It is unclear how the lack of "acute bony pathology" negates Wells's complaints of back pain where the X-rays revealed degenerative disc disease in the lumbar spine and central canal stenosis in the lower lumbar region, as Dr. Wilkins did not opine to that effect. Nor did the ALJ explain how Dr. Wilkins's opinion that Wells's back pain seemed to be "mostly from arthritis of the facet joints" undermines his complaints of back pain. Furthermore, the ALJ never mentioned the results of Wells's 2013 MRI that revealed a moderate bulge at L4-L5, and a mild bulge, mild facet arthropathy, and moderate foraminal narrowing at L5-S1, much less explained how the MRI results are inconsistent with Wells's complaints of back pain. (AR 742-43).

In weighing the medical source opinion evidence, the ALJ assigned "great weight" to the opinion of Dr. Corcoran, as affirmed by Dr. Ruiz, the reviewing state agency physicians who

found that Wells's physical impairments were "non-severe." (AR 28; *see* AR 91-92, 116-17). These state agency doctors, however, never saw Dr. Wilkins's treatment notes from 2013 or the X-rays and MRI results, as Dr. Corcoran issued his opinion in September 2012, and Dr. Ruiz affirmed it in December 2012. (AR 91-92, 116-70). The ALJ's failure to submit the evidence from 2013 to medical scrutiny is fatal in this particular instance, because this evidence "was new and potentially decisive medical evidence."[7] *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (collecting cases) (remanding case where the MRI results "undermined the reasoning of the second consulting physician, whose ground for disregarding the plaintiff's allegation that her condition had worsened was the lack of new supporting medical evidence in the file).

To explain, the 2013 medical evidence pertaining to Wells's back pain was potentially decisive because the ALJ assigned Wells an RFC for "a full range of work at all exertional levels," which included medium work. (AR 24). Medium work requires lifting up to 50 pounds occasionally and 25 pounds frequently, standing or walking six hours out of an eight-hour workday, and frequent bending or stooping. SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). "[S]tooping" is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist." SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). "Flexibility of the . . . torso is important for this activity." SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). In contrast, light work requires lifting no more than 20 pounds occasionally and 10 pounds frequently; standing or walking six hours out of an eight-hour workday; and occasional, rather than frequent, stooping. SSR 83-10, 1983 WL 31251, at *5-6 (Jan. 1, 1983).

---

[7] The Court also observes that Wells weighed 268 pounds in March 2013 and 291 pounds in September 2013, evidencing an increase in his obesity. (AR 746, 750); *see Gentle v. Barnhart*, 430 F.3d 865, 868-69 (7th Cir. 2005) (noting the aggravating effect of obesity on degenerative disc disease and in combination with psychiatric problems).

The distinction between medium and light work is "critical" in this case. *Dimmett v. Colvin*, 816 F.3d 486, 488 (7th Cir. 2016). This is because Wells is of advanced age (55 to 59 years), and there is no evidence that he has any transferable skills, as there is no VE testimony to that effect. (*See* AR 29, 298). "[A] person of [advanced age] who has no skills transferable to light or sedentary work is presumptively disabled." *Dimmett*, 816 F.3d at 488 (citations omitted). Therefore, if the ALJ had limited Wells to light or sedentary work, instead of "all exertional levels," and he had no transferable skills, he would have been deemed disabled under Grid Rule 202.06. *See* 20 C.F.R. § 404, Subpt. P, App'x 1; Table No. 2, Rule 202.06.

The ALJ was charged with building an accurate and logical bridge from Dr. Wilkins's 2013 treatment notes, the X-rays, and the MRI results revealing degenerative disc disease and back pain, to his conclusion that Wells could perform medium work. *See, e.g.*, *Pope v. Colvin*, No. 14 C 643, 2016 WL 1060280, at *3 (N.D. Ill. Mar. 11, 2016) (remanding case where the ALJ "failed to draw a logical bridge from his discussion of the medical evidence to his ultimate findings regarding [c]laimant's RFC that she could perform medium work"). In doing so, "an ALJ cannot play the role of doctor and interpret medical evidence [such as X-rays and MRI results] when he or she is not qualified to do so." *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) (citations omitted); *see Goins*, 764 F.3d at 680 (finding that the ALJ improperly played doctor by summarizing the MRI results and failing to submit the MRI to medical scrutiny); *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) ("This mistaken reading of the evidence illustrates why ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings."); *Hoyt v. Colvin*, 553 F. App'x 625, 627-28 (7th Cir. 2014) (finding that the ALJ improperly substituted his own medical judgment in place of the

claimant's treating physician by interpreting a lumbar MRI as inconsistent with the claimant's complaints of pain, observing that the state agency doctors did not review the test results and their dated opinions could not account for how the claimant's condition might have deteriorated). Here, the ALJ failed to build the necessary bridge. *See, e.g.*, *Robinson v. Astrue*, No. 10 C 2304, 2012 WL 1144821, at *15 (N.D. Ill. Apr. 5, 2012) (remanding case where the ALJ failed to explain how he arrived at an RFC for medium work in light of the claimant's degenerative disc disease).

There are other problems, as well, with respect to the ALJ's consideration of Wells's activities of daily living. The ALJ did not build a logical bridge between Wells's performance of rather minimal, light daily living tasks—such as watching television, spending time on the computer, doing laundry, light cleaning, cooking, attending medical appointments, taking the bus, and grocery shopping (AR 23-24, 26)—and an RFC for medium work. *See, e.g.*, *Castaneda v. Colvin*, No. 14 C 7023, 2016 WL 427511, at *2 (N.D. Ill. Feb. 4, 2016) (remanding case where "[s]imply put, the ALJ did not build the bridge between the Plaintiff's ability to perform certain daily activities and its bearing on his ability to work a full-time medium exertional level job").

Similarly, with respect to his mental impairments, the ALJ suggested that Wells must have overstated the effects of his panic attacks, anxiety disorder, and agoraphobia because he lives alone, could drive a car, is independent with his self care and household tasks, grocery shops, takes the bus, watches television, spends time on the computer, attends medical appointments, and is involved in "a lot of activities" relating to his treatment at the Bowen Center. (AR 23-24, 26). However, there are "critical differences between activities of daily

living and activities in a full-time job." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

"[A] person has more flexibility in scheduling the former than the latter, can get help from other

persons . . . , and is not held to a minimum standard of performance, as [he] would be by an

employer." *Id.* Also, "[t]here is a significant difference between being able to [leave home and]

work a few hours a week and having the capacity to work full time." *Larson v. Astrue*, 615 F.3d

744, 752 (7th Cir. 2010) (citations omitted) (finding that the claimant's part-time work for a

friend did not undermine her testimony that she is afraid to go out in public); *Bauer v. Astrue*,

532 F.3d 606, 609 (7th Cir. 2008) ("Suppose that half the time [the claimant] is well enough that

she could work, and half the time she is not. Then she could not hold down a full-time job."

(citations omitted)).

     In the past, Wells accommodated his panic attacks and agoraphobia by working in jobs,

such as a self-employed real estate appraiser, that afforded him flexibility of schedule and

unscheduled breaks:

> Most of my working life I have been in positions that would allow me to leave
> and go home to rest in the event of having a panic attack especially in the past ten
> years where I was a Residential Real Estate Appraiser and only had to leave my
> home a few times a week for about an hour and then return home to do the report
> a little at a time over several days until it was finished. This is a major problem
> with working at this time as I could and would have a panic attack at any time
> that would require me to just have to drop what I'm doing and go home to
> decompress. This decompression process could last anywhere from several hours
> to a few days.

(AR 299; *see also* AR 53-54, 57, 61, 73, 75-78); *see Larsen*, 615 F.3d at 752 ("[T]he ALJ's

conclusion that Larsen *accommodated* her fear of going out in public does not discredit her

testimony that she *has* a fear of going out in public and gives in to that fear regularly.").

Although the ALJ limited Wells to jobs "with no strict production quotas" (AR 25), the ALJ

never addressed Wells's likely need for unscheduled breaks or absences due to his panic attacks. *See Jelinek v. Astrue*, 662 F.3d 805, 812-13 (7th Cir. 2011) ("The activities the ALJ mentioned reflected only her willingness and ability to stay engaged in commendable but limited endeavors part-time or at her own pace.").

The Court's above-stated concerns are heightened by the fact that Wells appeared unrepresented at the administrative hearing. The ALJ's duty to develop a full and fair record is enhanced when a claimant appears without counsel at the hearing. *See Nelms v. Astrue*, 553 F.3d 1093, 1098-99 (7th Cir. 2009); *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997).

For these reasons, the ALJ's decision will be remanded for the purpose of submitting the medical evidence from 2013 to medical scrutiny and reassessing Wells's symptom testimony.

### D. Upon Remand, the ALJ Should Also Revisit the Weight Applied to the Opinions of Drs. Hill and Horton

Upon remand, the ALJ should also revisit the "great weight" applied to the opinions of Drs. Hill and Horton, the reviewing state agency psychologists. These doctors rendered their opinions in 2012, and thus, they never saw the treatment records from 2013 documenting Wells's more than 100 mental health visits to the Bowen Center doctors and counselors, including Ms. Lemke's GAF score of 50 and Wells's continued issues with panic attacks. *See Campbell v. Astrue*, 627 F.3d 299, 309 (7th Cir. 2010) (remanding case where the ALJ relied on the state agency psychologists' opinions, but these doctors did not have the benefit of reviewing a 15-month period of mental health treatment records that included GAF ratings never higher than 50); *see also Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (remanding case where the ALJ had assigned significant weight to the opinions of the state agency psychologists, but they had reviewed only a fraction of the claimant's treatment records that were available before

the claimant submitted additional evidence). When concluding that Wells could perform simple

tasks on a sustained basis, Drs. Hill and Horton both relied upon, at least in part, an April 2012

note from Dr. Wilkins stating that Wells was "not having panic attacks anymore but still a lot of

anxiety." (AR 93, 118, 332).

The Bowen Center's treatment records, however, were "the most recent professional

word" on Wells's mental impairments. *Jelinek*, 662 F.3d at 812 (remanding case where the ALJ

cast aside the recent treating doctor's opinion on Jelinek's mental impairments in favor of state-

agency opinions that were two years old); *Coppage v. Colvin*, No. 2:13-CV-405-PRC, 2015 WL

1243321, at *12 (N.D. Ind. Mar. 17, 2015) (remanding the case and noting that "the significant

weight the ALJ gave to the consultative reviewers' opinions is suspect in light of the time that

elapsed between their June and July 2011 opinions and the August 2012 hearing given the

intervening medical records, the subsequent treating physician opinions, and Plaintiff's

testimony"). These 2013 records reveal that Wells was diligently participating in mental health

treatment and making progress in accommodating his symptoms, but that he was still

experiencing some panic attacks, which were described as "Improved, Not Controlled." (*See,

e.g.*, AR 394-95, 398, 401, 415, 423, 438, 450, 452, 456). These records could have affected the

opinions of the state agency psychologists.[8] *See Buechel v. Colvin*, No. 11 C 4348, 2013 WL

1200611, at *12 (N.D. Ill. Mar. 25, 2013) (collecting cases that remanded because the ALJ relied

---

[8] With respect to Wells's DIB claim, "[a]s a simple matter of logic, even if medical evidence . . . did not exist at the date last insured, that fact standing alone does not mean that such evidence lacks probative value as to a plaintiff's pre-date last insured impairments." *Freismuth v. Astrue*, 920 F. Supp. 2d 943, 951 (E.D. Wis. 2013) (citing *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998); *Allord v. Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006)); *see also Phelps v. Colvin*, No. 13-cv-1211-CJP, 2014 WL 7360196, at *5 (S.D. Ill. Dec. 23, 2014) (stating that medical treatment rendered after the date last insured can be considered if it helps to illuminate the claimant's condition during the insured period).

upon state agency doctors' opinions that were not based on a complete review or accurate summary of all the relevant medical evidence); *Ivey v. Astrue*, No. 2:11-CV-83, 2012 WL 951481, at *13 (N.D. Ind. Mar. 20, 2012) (recognizing that an ALJ's decision to give more weight to a reviewing state agency doctor's opinion "cannot stand where it lacks evidentiary support and is based on an inadequate review of [the claimant's] subsequent medical record").

Therefore, upon remand, the ALJ should also submit the mental health evidence from 2013 to medical scrutiny for the purpose of reassessing Wells's symptom testimony, reconsidering the medical source opinion evidence, and reassessing the RFC.[9]

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Wells and against the Commissioner.

SO ORDERED.

Entered this 28th day of March 2017.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge

---

[9] Because a remand is warranted on these grounds, the Court need not reach his remaining arguments.